JOHN DEACON, APPELLANT, v. CHARLES OLIVER AND ROBERT M. GIBBES, EXECUTORS OF ROBERT OLIVER, DECEASED.

Under the attachment laws of Maryland, a share in the Baltimore Mexican Company, which had fitted out an expedition under General Mina, was not, in 1827, the subject of an attachment under a judgment, whether such share was held by the garnishee under a power of attorney to collect the proceeds, or under an equitable assignment to secure a debt.

The answers of the garnishee to interrogatories filed, were literally correct. He had not in his hands any "funds, evidences of debt, stocks, certificates of stock," belonging to the debtor, nor "any acknowledgment by the Mexican government," on which an attachment could be laid.

THIS was an appeal from the Circuit Court of the United States for the District of Maryland, sitting as a court of equity.

The bill was filed by John Deacon, the surviving partner of Baring, Brother & Company, of London, under the following circumstances:

In 1821, Baring, Brother & Company obtained a judgment, in the Circuit Court of the United States for the District of Maryland, against one Lyde Goodwin for $60,000, upon a bill of exchange, to be released on payment of $41,005.58, with interest and costs. Goodwin was at this time the owner of one ninth share in the Mexican Company, the history of which is given in the report of the case of Gill v. Oliver's Executors, 11 How. 529. This judgment was kept alive until the issuing of the attachment hereafter spoken of, in 1826.

On the 19th of July, 1823, the government of Mexico passed a decree, declaring that General Mina, amongst other persons, was a benefactor of his country; and on the 28th of June, 1824, another decree, acknowledging the debts contracted by the Generals declared to have been benefactors.

On the 11th of January, 1825, Lyde Goodwin addressed a

letter to Mr. Oliver, which is too long to be inserted, but which was of the following tenor. He states the claim to have been acknowledged by Mexico; that the amount of his original pro-- portion of the claim, exclusive of interest, was twenty thousand dollars; that his object in proposing to assign his interest therein was, 1st, to secure to Oliver the sum he already owed him; and 2d, to obtain barely the means of support for the present, and that the additional sum he would acquire, should not exceed $2,000.

Between this date and June, 1825, Oliver paid to Goodwin $2,000, and received an assignment of the share from Brown, the trustee in insolvency of Goodwin.

On the 22d of March, 1825, the company appointed Oliver their attorney to prosecute the claim, and informed him that Goodwin was entitled to a commission of five per cent. in addition to his one ninth share.

On the 28th of October, 1826, an attachment under the act of Maryland, of 1715, was issued upon the judgment against Goodwin, and laid in the hands of Oliver, as garnishee. At the same time, the following interrogatories were filed, which the garnishee was required to answer.

Interrogatory 1. Had you, at the time of laying the attachment in the above cause, in your hands, or at any other time, and when, any funds, evidences of debt, stocks, certificates of stock, belonging to Lyde Goodwin, or any acknowledgment of debt due by the government of Mexico to the said Lyde Goodwin?

2. Did not the said Lyde Goodwin transfer to you some certificate of stock, or evidence of debt due by the said Mexican government to Goodwin, or some document of that character, and when did such transfer take place?

3. Had you not a claim against said Goodwin, secured by a transfer or pledge of some certificate of stock, or document of a public character, showing that Goodwin was entitled to receive some funds from the Mexican government? If so, what was the amount of your claim so secured, and what was the security; was, or was not, the balance or remaining credit, under your control at the time of laying the attachment? State particularly how your claim was secured.

4. Do you know any other matter or thing that may be of advantage to the plaintiffs, in the above cause? If so, state it as fully as if you were particularly interrogated thereto.

In December, 1827, Oliver filed the following answers:

1. To the first interrogatory he answers: That he had not, at the time of laying the attachment in the above cause in his hands, nor at any other time, any funds, evidences of debt,

stocks, or certificates of stocks, belonging to Lyde Goodwin, or any acknowledgment of debt due by the government of Mexico; but that he had a power of attorney signed by said Lyde Goodwin, in conjunction with several other persons, claimants of a debt alleged to be owing by the Mexican government, and authorizing him to claim and receive the same for the benefit of said Goodwin's assignees and others.

2. To the second interrogatory he answers: That the said Goodwin did not transfer to him any certificates of stock or evidences of debt due by the Mexican government, or documents of that character, unless the before-mentioned power of attorney may be called one.

3. To the third interrogatory he answers: That he had, and still has, a large claim against said Goodwin for money lent him from time to time; that he is not secured for this debt, and never has been secured, by a transfer or pledge of some certificate of stock, or document of a public character, showing that Goodwin was entitled to receive some funds from the Mexican government, unless the aforesaid power of attorney be deemed such, but which he does not admit it to be.

4. To the fourth interrogatory he answers: That he knows nothing.

On the 10th of January, 1829, the counsel for the Barings caused the following entry to be made upon the docket, relative to the attachment: "Discontinued without costs."

On the 30th of May, 1829, Oliver obtained from Goodwin the following paper:

"Being indebted to Robert Oliver, of Baltimore, upwards of nine thousand dollars, I hereby assign, transfer, and make over to the said Robert Oliver, in payment of my debt to him, the following objects, which were assigned to him many years ago, to secure the payment of the said debt due by me, to wit, all my undivided ninth part, and right, title, and interest of every kind whatsoever, in the claim on the government of Mexico for supplies furnished, and advances made, to the late General Mina, or the proceeds thereof, and which claims are under the control of the said Robert Oliver and his agent, John Mason, Jr., now in Mexico; also a claim on a certain Louis Merwin, who died some years ago in Havana. The object and intention of this assignment, is to make a full and complete transfer to the said Robert Oliver of all my right, title, and interest, as aforesaid, for which said Robert Oliver has agreed to balance my account on his books, and to consider the same as satisfactorily settled; and I hereby authori‑ and order all my agents, or those holding any powers of atto‑ ey or instructions from me

relative to the aforesaid property, to account with the said
Robert Oliver for the same, or the proceeds thereof.

"L. GOODWIN.

"Baltimore, May 30, 1829.
"Witness — JOHN THOMAS.

"I confirm the above agreement.    ROBERT OLIVER."

This claim was prosecuted under the treaty between the
United States and Mexico, with the following result:

On the 11th of April, 1850, there were paid to Oliver's
executors (he having died in 1834) the following sums, being
net proceeds:

On account of Goodwin's commissions . . . . 22,143.12
"    "    " his share . . . . . . . . . 35,110.47

$57,253.59

In November, 1850, Deacon filed his bill against the execu-
tors, alleging that the answers of Oliver were untrue and
evasive, by means of which deception the attachment had been
discontinued; that at the time when it was laid, Oliver had
under his control the evidences of debt due by the Mexican
government; that so far from having a mere power of attorney
from Goodwin to collect the debt, he had a transfer of the
claim for the purpose of security, which, being irrevocable, was,
by the laws of Maryland, the subject of an attachment, &c.

The executors of Oliver answered, and upon a hearing of the
cause, the Circuit Court dismissed the bill, when the complain-
ant appealed to this court.

It was argued by *Mr. Davis* and *Mr. Howard*, for the appel-
lant, and *Mr. Campbell* and *Mr. Johnson*, for the appellees.

As the decision rested mainly upon one point of the case,
namely, that, at the time of laying the attachment, Oliver had
no interest which was attachable, many of the arguments of
counsel upon other points, are omitted.

The following extract from the brief of Mr. Davis contains
his view of the leading points of the case.

1. That a debt due by a foreign or domestic government is
assignable, passing, by insolvency, to executors or administra-
tors, and liable for debts of claimant, and liable to all the inci-
dents of other debts, excepting that it cannot be enforced by
suit. Comegys *v.* Vasse, 1 Pet. 193, 215, 217; Sheppard *v.*
Taylor, 5 Pet. 675; Plater *v.* Scott, 6 Gill & Johns. 116; Gorgier
*v.* Mieville, 3 Barn. & Cress. 45; 10 E. C. L. R. 16.

2. That the Court of Appeals of Maryland have decided,

that, by the local law, the share of Lyde Goodwin, now in controversy, and his commissions, did not pass to his insolvent trustee in 1817, because then under the ban of the public policy of the country; but that after the decrees of 19th July, 1823, and 28th June, 1824, of Mexico, it became a fair and valid debt, due by the Mexican government, and as such was assignable, and did pass by the assignment of Goodwin of 1825, and 30th May, 1829.

3. That the Supreme Court have pronounced the above to have been the decision of the Court of Appeals; and that being on a question of local municipal law, not involving any law of the United States, such decision could not be reviewed by them. Gill v. Oliver's Ex's, 11 How. 529; Williams v. Oliver's Ex's, 12 Id. 111, 125.

4. That the award of the Mexican commission and the decree of the Court of Appeals, are conclusive upon Robert Oliver's representatives and in our favor, of the nature and origin of the fund, of the validity and assignability of the funds, and its liability to all legal incidents of a valid legal claim, from 1824 down to this time. Comegys v. Vasse, 1 Pet. 212; Sheppard v. Taylor, 5 Id. 708, 709, 713; Frevall v. Bache, 14 Id. 97; De Vallingan v. Duffy, Id. 290, 291; Barry v. Patterson, 6 Har. & Johns. 203, 204.

II. That the assignment of 1825 was a mortgage on the fund to secure the prior debt of Goodwin to Oliver, and the $2,000 then advanced; subject to which Goodwin remained owner of the fund, and Oliver was accountable to him.

1. This appears from Goodwin's letter to Oliver, 11th January, 1825; his receipt, 15th February, 1825; Brown's assignment, 21st March, 1825; and Goodwin's receipt, 24th March, 1825; and the assignment of 30th May, 1829.

The letter did not propose a sale; there was no estimate of the value of the claim; Goodwin considered it likely to be received in a year, and looked on it as worth $20,000, or more.

His objects he said were— 1st. To secure a debt he then owed; but if it were a sale for $2,000, it secured nothing; 2d. To obtain the bare means of support for the present. He then plainly looked to the remainder of the fund as his support for the future.

The additional sum I shall want shall not exceed $2,000," is the language of a borrower, and implies a previous loan now to be added to. The receipts are, on account of his share, or interest.

The assignment, signed by Brown, mentions no value given. It was a mere precaution to preclude a possible claim. The assignment of 1829, May 30, finally, is express and decisive as

to the former assignment, being for security merely, and itself purports to assign and relinquish the remaining right of Goodwin. It recites a debt of $9,000; but the answer shows only $8,500, including the $2,000. So it continued to be a debt, and so was not a payment on a sale. If it were a sale, then "the words to secure you the sum I already owe you," must be construed to make that sum a part of the consideration of the sale; and it also would cease to be a debt. If it were a sale, then the assignment of 30th May, 1829, would not only recite a falsehood, but be an absurdity. It cannot be half sale and half mortgage; a sale for $2,000 and a mortgage for $6,000.

The assignment of 1825 was therefore a mortgage, agreed by the act of the parties to be worth $8,000, and considered by Goodwin worth more than $20,000, and likely to be paid in cash in a year.

2. That such an assignment is in law a mortgage, or security merely, the following cases prove: 1 Story Eq. Jur. § 1018; 1 Cruise (by Greenleaf) tit. 15, ch. 1; Conway v. Alexander, 7 Cranch, 218, 241; Hughes v. Edwards, 9 Wheat. 489; Morris v. Nixon, 1 How. 118, 122, 123, 124, 126, 127, 130, 131; Dougherty v. McCalgan, 6 Gill & Johns. 275, 280, 281.

.3. That on mortgage, or pledge, or transfer, by way of security, the mortgagor is treated as the substantial owner, subject to the lien of the creditor. His right to redeem is an incident inseparable. It may be assigned or pass to his representatives, or to his insolvent trustee, or in bankruptcy, or a judgment creditor may claim to stand in his place and to redeem.

This principle applies to securities of chattels as well as of lands, and to choses in action as well as to either. Morris v. Nixon, 1 How. 123, 124, 126, 129; 5 Johns. R. 345; 2 Story Eq. Jur. §§ 1023, 1052; Dougherty v. McCalgan, 6 G. & J. 281, 282; Hudson v. Warner & Vance, 2 Har. & G. 415; Hartley v. Russel, 2 Sim. & Stu. 244; Milne v. Walton, 2 Younge & Col. 354, 362.

III. That, therefore, Lyde Goodwin retained such a property and interest in the claim on Mexico, after its assignment to Oliver, as was liable in some way to be subjected to the payment of his debts by judgment. Being an equitable interest in a chose in action, it could not be subjected to the common-law execution of *fieri facias*.

It could then be reached by one of two processes only; either, 1st, by attachment in the nature of an execution; 2d, by bill in equity to subject the surplus.

The appellant insists that it could be subjected by either of those modes, and that the laying the attachment was a fit preliminary; and that the fraud is the same in either view.

1. By execution of attachment.

*a.* The act of 1715, § 7, gives any judgment creditor of any person right, in lieu of any other execution, to sue out an attachment against the goods, chattels, and credits, of the defendant, in his own hands, or in the hands of any other person.

The policy of our law is to subject every species of property to execution. Somerville *v.* Brown, 5 Gill, 422.

It is an execution. Baldwin *v.* Wright, 3 Gill, 246.

The attachment was intended to cover every species of property not liable to be taken by *fi. fa.*, and for which, before plaintiff had been driven into equity to get hold of; and that it would not lie where a *fi. fa.*, lay. For example —

*Fi. fa.* lay only for chattels held by *legal title.* 10 G. & J. 226, 261; Harding *v.* Stevenson, 6 H. & J. 267. Attachment covers that by *equitable title.*

Legal estates in land, by the act of 1732, are sold on *fi. fa.* Equitable estates, as equities of redemption, by attachment, but not to *fi. fa.* Ford *v.* Philpot, 5 Har. & J. 312; 5 Johns. R. 336.

Goods consigned to merchants who had lien on them were not liable to *fi. fa.*, but were to attachment. 6 Har. & Johns. 267, 268; Nathan *v.* Giles, 5 Taunt. 558.

The lien of a judgment could not be sold on *fi. fa.*, but the judgment could be attached, and court could execute it. Wells *v.* Ghiselin, 1 Har. & McH. 91.

Surplus money in sheriff's hands could not be taken on *fi. fa.* but might by attachment. 1 Har. & Johns. 546; 5 Har. & Johns. 312.

Attachment lies for a credit or a chose in action, or for stocks, because they are not liable to *fi. fa.* Evans, Pr. 364.

But chattels in defendant's possession were not liable to attachment, because they could be taken by *fi. fa.* 3 Har. & McH. 594, 615, 616, 617.

Thus the policy of the attachment law was to give a residuary execution, covering every case not before covered. The words goods and chattels, and lands, covering interests in lands, and goods and chattels, which could not be taken by *fi. fa.* and credits, being used to designate every thing in the nature of a chose in action.

*b.* The claim on the Mexican government, assigned by Goodwin, was a credit of Goodwin in the hands of Oliver, and so liable to attachment in his hands.

The statute does not confine the attachment to credits in the hands of the debtor, but extends it to the credits of the defendant in the hands of the plaintiff, or any other person.

The most common case is the attaching the credit in the

Deacon v. Oliver et al.

hands of the debtor, or person owing the money to the defendant.

But the act does not define the subject-matter on which the attachment may be laid by any reference to the person in whose hands it may happen to be. The credit is the thing attached; it may be attached in the hands of the plaintiff, or any other person.

May, then, a credit be in the hands of any person but the debtor, who himself directly owes the money to the defendant?

A credit is a right to demand money from some one. It is equivalent to the legal phrase, a chose in action — a thing to be sued for.

Now, a right in A to recover money from B for the use of C, is matter of every day occurrence.

If D have judgment against C, may he not lay an attachment in the hands of A, who holds a credit or chose in action against B for the benefit of C, especially if B be out of the State?

2. The modern law recognizes the assignability of choses in action, operating an actual transfer *proprio vigore* of the title of the chose in action, or credit, from the assignor to the assignee, vesting the latter with all the rights of the former, the possession of the evidences, and the right to enforce the claim, as effectually as a bargain and a sale of lands. 2 Story, Eq. Jur. § 1057; Comegys v. Vasse, 1 Peters, 213, 215, 217; Spring v. S. C. Ins. Co. 8 Wheat. 268; Bohlen v. Cleveland, 5 Mason, 174; Harrison v. Sterry, 5 Cranch, 289, 300, 302; Evans et al. v. Merriken, 8 G. & J. 39, 46–49; Ex parte South, 3 Swanst. 372, 373; Conrad v. Atlantic Ins. Co. 1 Peters, 386, 441; Black v. Zacharie, 3 How. 483, 512.

As between successive assignments, the title vests according to the dates, a former being liable, however, to be postponed to a later one by failure to notify the person liable to the assignor in proper time. Anderson v. Tompkins, 1 Brock. 456; Hudson v. Warner and Vance, 2 H. & G. 415, 418, 427, 432; Houston v. Nowland, 7 G. & J. 480, 493; Loveridge v. Cooper, 3 Russ. 1; Cooper v. Tynmore, 3 Russ. 60; 3 How. 483, 512.

3. By the assignment of 1825, therefore, the chose in action or credit belonging to Goodwin, and due by Mexico, was vested in and held by Oliver for the benefit of Goodwin, after paying his debt. He held the evidences, the sole legal right to prosecute and control it, to collect and receipt for it.

To refuse to apply the attachment to such a case, is to withdraw from its reach half the cases it was provided to remedy, forcing the judgment creditor back into a suit in equity; e. g. all cases where a credit or chose in action of a judgment debtor

is in the hands of any one, except the person ultimately liable to pay the money.

A consignee has sold goods and taken notes of the purchaser, not yet due, to the consignor. The goods could have been attached — may not their proceeds, in the shape of notes, in the hands of the consignee, on a judgment against the consignor?

Chattels and choses in action are assigned in trust, the debtors living out of reach of process, to sell and pay to A B. The chattels may be attached in the hands of the trustee — may not the bonds and notes be attached, so as to bind the proceeds when collected?

United States stock is held by a trustee for A B. It is an obligation to pay money; may the stock — the right to receive the money, not merely the quarterly instalment, be attached; and, if so, in whose hands but the trustee's?

So stocks of all non-resident corporations will escape execution, unless they be attachable in any hands holding the certificates for the person entitled to receive the proceeds.

The stock, like the debt, is a credit, the money payable ultimately by one person; but the right to receive it, the title to it, being in the hands of a third party for the owner, with the evidences on which alone it is payable. It is case of a credit in the hands of such party, and may be attached there.

The very point has been decided twice in Massachusetts. N. E. M. Ins. Co. v. Chandler, 16 Mass. 274, 279; 6 Mass. 339, 342.

The Massachusetts law uses the words, "goods, effects, and credits," equivalent to "goods, chattels, and credits." Attachment laid on goods and notes for collection in the garnishee's hands. Erskine v. Staley, 12 Leigh, 406.

Or put the case of a legacy specific, of a note, or chose in action, where executor is here, and person liable on the chose in action beyond process.

c. The attachment was rightly laid in Oliver's hands, for it must be laid in the hands of the possessor of the thing attached. Van Brunt v. Pike & Ward, 4 Gill, 270, 276.

And possession of the evidences, together with the assignment, vests the possession of the chose in action in transferee. Dearle v. Hall, 3 Russ. 1; Farmers' Bank of Delaware v. Beaston, 7 G. & J. 428, 429; Gardner v. Lochlan, 4 Myl. & Craig, 129, 133; Black v. Zacharie, 3 How. 483, 512.

That Oliver is legally chargeable with the possession of the evidences of debt, since they were under his control, and should have so stated it. Morrice v. Livaby, 2 Bevan, 500; Attorney-General v. Bailiff of E. R., 2 Myln. & K. 35; 2 Danl. Ch. Pr. 259, 260.; Woods v. Morsell, 105, 107.

Deacon *v*. Oliver et al.

*d.* That the money had not been actually received, was no obstacle to a judgment of condemnation, with a stay of execution till it should be collected; for the court has power to modify its judgments and process to suit the exigency of each case; e. g. where property is subject to a lien, to have it ascertained was to get at the surplus. Davidson's Lessee *v.* Beatty, 3 H. & McH. 594; Pratt *v.* Law, 9 Cranch, 456, 496; Serg. on Attach. 91, 94; 2 Rawl. 227.

And where laid in the hands of a debtor, on a debt not yet due, no plea of *nulla bona* is allowed; but condemnation is given, and execution stayed till debt due. Somerville *v.* Brown, 5 Gill, 399; Serg. on Attach. 101, 102, 109.

Or where papers detained abroad. 4 Dall. 253; 2 Binney, 453; Serg. on Attach. 145.

So the court could have condemned Goodwin's interest, and either have sold it or evited its collection.

*e.* That the attachment, by way of execution, applies to all judgments, without regard to the residence of the defendant. 1 D. L. M. 22, 23; Act 1715, ch. 40.

1. The operative words of the section giving the remedy are of the widest possible scope.

2. The use of the word "absent" before defendant, occurs only in the last clause of the section requiring notice of the garnishee.

3. They only create a *doubtful implication*, which is not sufficient to limit the universality of the enacting words.

4. This section expressly dispenses with the prerequisites prescribed in the 1st and 2d sections, providing for the protection of absent defendants.

5. The 5th section of the act implies, that an attachment may be levied on the goods of a resident. (Printed out of place, 1 D. L. M. 763.)

6. The oldest forms of attachment, by way of executions, apply to residents. 2 Harris's Entries, 611; 2 Evans's Harris, 377.

7. The defendant must have been in the State before judgment could have been recovered; yet 2d section prescribes no way to show the removal.

8. The law of 1831, ch. 321, is declaratory, and not binding; the United States courts ought not to be allowed to raise an implication, so as to do by construction what it could not do by enactment.

9. It contravenes the whole purpose and policy of the attachment, by way of execution.

*f.* If, therefore, the court think the assignment of 1825, or any assignment before October, 1826, covered the commissions on the Mervin claim, they are covered by the above reasoning.

But if not, yet Oliver, holding possession of the evidences, the right to receive the proceeds, and being the party directed to pay Goodwin, he held Goodwin's claim to the commissions as agent, sufficiently to make him a fit garnishee, as having that credit in his hands.

Though the court doubt as to the commissions and Mervin debt, that will not affect the mortgage of the share in the company.

This fund could have been reached by bill in equity.

(a.) A bill in equity is competent to compel the application of the equitable property, the choses in action and equities of redemption of a judgment debtor which cannot be reached by *fi. fa.* to the satisfaction of the judgment. Scott *v.* Scholly, 8 East, 467, 508, 509; Clayton *v.* Anthony, 6 Rand. 285; Dold *v.* Geiger, 2 Grat. 112; Halley *v.* Williams, 1 Leigh, 140; Hadden *v.* Spader, 20 Johns. Rep. 554, 563, 564, 568; 2 Johns. C. C.; McDermott *v.* Strong, 4 Johns. C. R. 687, 690, 692; Bayard *v.* Hoffman, 4 Johns. C. R. 450; Spader *v.* Davis, 5 Johns. C. R. 280; Hallett *v.* Thompson, 5 Page, 583; Griffith *v.* Fred. County Bank, 6 Gill & Johns. 424; Harris & Chauncey *v.* Alcock, 10 Gill & Johns. 251, 252; McDonald *v.* Bank U. S. 2 Pet. 107.

(b.) An execution is usually required as precedent to suit in equity.

The attachment was such an execution. Even if no condemnation could have been had under it; yet neither can an equitable interest in chattels or land be sold under a *fi. fa.* at common law. But the *fi. fa.* is held to bind them, and a bill lies in equity to sell them.

So here, the attachment was the most appropriate form of execution to bind an interest, in the nature of a credit or chose in action, as preliminary to a bill in equity, to have it applied to the satisfaction of the judgment.

(c.) To this preceeding the facts of the assignment, by way of mortgage to, and the possession of the evidences by Oliver, were as essential as to the sustaining of the attachment.

The untrue denials in the answers of Oliver equally misled the plaintiff to the abandonment of his remedy.

The fraud gives the plaintiff an equal equity now to call on the court to do him justice by subjecting the fund to his judgment, after paying Oliver his debt and expenses.

The points raised by the counsel for the appellees were as follows:

The theory of the bill is, that the appellant had, by the attachment on the judgment of himself and co-plaintiffs, entitled himself to condemnation of Goodwin's funds, alleged to be in

Oliver's hands as garnishee, and that Oliver, by his false and fraudulent answers, having deprived him of his legal right to such condemnation, equity will compel Oliver's estate to pay the money which, but for his unconscientious conduct, would have been recovered at law.

A right to condemnation, then, as against Oliver, and the loss of that right through his fraud and falsehood, are essential, on the appellant's own showing, to his success.

Neither of these elements are found in the case, as it appears on pleadings or proofs.

1st. The attachment was issued against law, and would, at the trial, (which never came on, because the plaintiffs in the attachment discontinued it,) have been quashed, and is therefore to be regarded as void. Act of Maryland, 1715, chap. 40, § 6; Waters & Caton, 1 Harris & McHenry, 407; Harden & Moores, 7 Harris & Johnson, 4.

2d. The attachment was irregular and void for another reason; that the act of 1715, (above referred to,) and adopted by the 100th rule of the Circuit Court of Maryland, authorized no such writ in the case of a resident defendant. Act of 1831, chap. 321.

3d. But conceding the attachment to have been regular, it could only take the "lands, tenements, goods, chattels, or credits," of Goodwin, in Oliver's hands, (see Writ, 19, 20,) and there being none of these things in his hands, there was nothing to attach, and of course nothing to condemn. Houston & Nowland, 7 Gill & Johnson, 480; Meeker and Wilson, 1 Gallison, 419; Act of Maryland, 1810, chap. 160; Ford & Philpot, 5 Harris & Johnson, 312; Campbell & Morris, 3 Harris & McHenry, 535; 9 Cranch, 477.

4th. If there was any thing in Oliver's hand at the time of the attachment, it was only Goodwin's claim on the government of Mexico, for assistance rendered to Mina, in his attempt to revolutionize Mexico when a province of Spain, in violation of our neutrality acts; and such a claim has been decided by the Maryland courts, in the case of Goodwin's trustee against these appellees, to be of such a character that the law of Maryland will not recognize its existence, and of course no condemnation could be had of it.

5th. The discontinuance of the attachment was the voluntary act of the appellant; and as he was not bound by Oliver's answers to the interrogatories in attachment, but might have tested their truth by bringing the attachment to trial, his failure to proceed at law gives him no right to come into equity.

6th. Oliver's answers were true. Goodwin's share in the Mexican Company was assigned to Oliver absolutely in 1825,

and no interest therein remained in Goodwin at the time of the attachment. Goodwin's interest in his commissions and his claim on Mervin were not assigned to Oliver till May, 1829, nearly two years after the answers, and at the time of the attachment Oliver had no interest whatever in either of these claims.

Mr. Justice GRIER delivered the opinion of the court.

Without attempting to give a history of the facts of this case, as exhibited in the pleadings and proofs, or noticing all the objections of the equity of the bill, we think there are two of its charges or allegations, on which its whole equity rests, and which the complainant has failed to substantiate.

1. That there were in the hands of Robert Oliver at the time the attachment was laid, any chattels, rights, or credits of Lyde Goodwin, "which were bound by said attachment."

2. That Robert Oliver was guilty of falsehood or fraudulent concealment of facts, in his answers to the interrogatories proposed to him as garnishee in the attachment.

In 1816, and previous to his insolvency, Lyde Goodwin had become a shareholder in the Baltimore Mexican Company, to the extent of one ninth part. This company had furnished means to General Mina to fit out a warlike expedition against Mexico, then a dependency of Spain. The expedition of Mina had failed, and he had perished with it. This transaction of the company was illegal, and punishable as a misdemeanor, with fine and imprisonment. The contract was therefore void in law, and could not be the foundation of any debt, nor could the stock thus created be treated in law as a thing of value; and from the uncertainty of its future prospects, its value in the market was little better. It was merely possible that Mexico, if successful in her struggle for independence, might, at some future day, assume the payment of the debts contracted by Mina, and if, as it was possible, or perhaps probable, that at some day still further in the future the payment may be obtained. Goodwin's title in this possibility or expectancy, or whatever it might be called, was supposed to have passed to Brown, his assignee, under the insolvent act. Afterwards, in 1824, Mexico having achieved her independence, passed a decree promising to acknowledge " the debts that may be proven to have been contracted for the service of the nation by the Generals declared *bene meritos de la patria*," of whom Mina was one. This renewed the hopes of the company, that possibly something might be recovered hereafter on this pledge of the Mexican government; and Robert Oliver was appointed the attorney on the part of the company to prosecute their claim. Lyde Goodwin

being in actual want of the means of subsistence, persuaded Robert Oliver to advance him the sum of two thousand dollars, and take a transfer from Brown, his insolvent trustee of this claim, as security.

In this situation of affairs, the attachment of Baring, Brothers & Co. was served on Robert Oliver, as garnishee of Lyde Goodwin, in 1827. Now it is admitted that Oliver was a creditor of Lyde Goodwin, and not a debtor. His power of attorney put him in possession of nothing which could be attached as the property of Goodwin. The insolvent assignment was supposed to have vested Goodwin's interest in this expectancy, in Brown. If it did not do so, as has since been decided, Oliver had no title to Goodwin's claim. And if it did, and if Oliver held it merely as a security for the sum advanced by him, the equitable assignment taken as such security, was his own ; it was but an instrument to obtain satisfaction for his debt; it conferred nothing but a right in equity. Whether it was valid or invalid, absolute or defeasible, it did not constitute him a debtor of Lyde Goodwin, or put him in possession of any of his credits or effects, so as to subject him to an attachment as Goodwin's garnishee. It was not till after the death of Robert Oliver, and more than ten years after the attachment of complainant was discontinued, that the United States made the Convention of April, 1839, with Mexico, under which Commissioners were appointed, before whom this claim of the Baltimore Company was proved, and acknowledged by Mexico as a just debt. Then for the first time, this uncertain claim or equity, assumed the form of a credit, and an existence as a legal chose in action. But in that character it never existed in the hands of Robert Oliver. If, at the time the attachment was served on him, the claim of Lyde Goodwin had existed as a debt due him by a citizen of Maryland, and Oliver held an equitable transfer either absolute or defeasible, it is abundantly evident that the proper person to be made garnishee in an attachment, would have been the debtor, not the equitable claimant of the debt. He has but an equity or a bare right, but whatever it is, it is his own, and his claim is in hostility both to the plaintiff and defendant in the attachment.

The whole foundation of the complainant's equity in this bill rests on the averment, that the interest of Lyde Goodwin, whatever it was, in this Mexican claim, " was bound by the attachment laid in the hands of Robert Oliver, as garnishee." The Merwin claim not having been assigned till after the attachment was withdrawn, need not be noticed. The decision of this point against the averment of the bill, would dispose of the case.

But as we think the charges made in the bill against Robert

Oliver, of false and fraudulent concealment, have not been sustained, it is due to the memory of one who always sustained a high reputation as a merchant and man of honor, to notice this point.

It must be remembered that the purpose of the interrogatories was to ascertain whether Oliver had in his hands any credits or effects of Lyde Goodwin, subject to attachment; and also that Brown, the insolvent assignee of Goodwin, was supposed to have had the title to Goodwin's interest vested in him. The legitimate inquiry was, therefore, not whether Brown had abused his trust, by selling or mortgaging the trust property for the benefit of Goodwin; or whether Oliver's claim under the assignee was valid or not. This inquiry was wholly irrelevant in the investigation, under the attachment proceeding. Nor was Oliver bound, in that investigation, to make any disclosure of the strength or weakness of his own title, which was hostile to that of the plaintiff. The discovery sought, was not of Oliver's equities, but of Goodwin's assets. Oliver's answers to the interrogatories were drawn, no doubt, by learned counsel, fully aware of the nature of the proceedings, and the rights of the parties under them. The answers were strictly true to the letter. The garnishee had not in his hands, "any funds, evidences of debt, stocks, certificates of stock, belonging to Lyde Goodwin, nor any acknowledgment by the Mexican government to said Lyde Goodwin," on which the attachment could be laid. What claims or securities he himself had as a creditor of Goodwin, the plaintiff in that proceeding had no right to inquire, nor was Oliver bound to answer. If he had nothing which the plaintiff could attach, it was no fraud on plaintiff to keep his own counsel, and make no disclosure as to the nature of his own securities.

The decree of the Circuit Court is therefore affirmed.

## *Order.*

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Maryland, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed, by this court, that the decree of the said Circuit Court in this cause be, and the same is hereby, affirmed, with costs.